**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

KENNETH COPELIN,

     Plaintiff,

v.                                           Civ. No. 18-727 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,[1]

     Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**[2]

THIS MATTER is before the Court on the Social Security Administrative Record (Doc. 18), filed October 9, 2018, in support of Plaintiff Kenneth Copelin's Complaint (Doc. 1) seeking review of Defendant the Commissioner of Social Security's decision denying Mr. Copelin's claim for supplemental security income. On December 7, 2018, Mr. Copelin filed a Motion to Reverse the Administrative Law Judge (ALJ) Unfavorable Decision Dated June 23, 2017 As Well As the Appeals Council Ruling Dated June 19, 2018: Alternatively Motion to Remand Case Back to the Administrative Law Judge. (Doc. 21.) Mr. Copelin filed a memorandum in support of his motion on the same date. (Doc. 22.) The Commissioner filed a response in opposition to the motion on February 13, 2019, and Mr. Copelin filed a reply in support of it on February 27, 2019. (Docs. 24, 25.)

The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the relevant law and

---

[1] Andrew Saul was confirmed as the Commissioner of Social Security on June 4, 2019, and is automatically substituted as a party under 42 U.S.C. § 405(g) and Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 10.)

being otherwise fully advised, the Court finds that Mr. Copelin's motion is well taken and should be GRANTED.

## I.  Background and Procedural History

Mr. Copelin alleges that he became disabled on May 9, 2011, at thirty-seven years of age, due to hypertensive urgency, chronic headaches, shoulder, knee, and elbow joint pain, upper and lower back pain, stars/lightning in visual range, inability to handle heat, numbness of legs and feet, chest pain, depression, and lack of concentration and memory.  (AR 240-41.)  Mr. Copelin completed four or more years of college in 2005 and earned a bachelor's degree in psychology.  (AR 44-45, 241, 359.)  In the relevant past, he worked as a warehouse worker and a stock clerk.  (AR 47-48, 140.)

On July 8, 2014, Mr. Copelin applied for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*[3]  (AR 219.)  Mr. Copelin's application was denied initially on January 23, 2015, and on reconsideration on July 13, 2015.  (AR 113, 127-28.)  On September 7, 2015, Mr. Copelin requested a hearing before an Administrative Law Judge ("ALJ").  (AR 162-64.)  ALJ Michael Leppala conducted a hearing in Albuquerque on March 16, 2017.  (AR 40-96.)  Mr. Copelin appeared from Las Cruces by videoconference with his attorney, Jaime Rubin.  (AR 40-41.)  The ALJ took testimony from Mr. Copelin and from an impartial vocational expert ("VE"), Phunda Yarbrough.  (AR 40, 44-96, 301.)  On June 23, 2017, the ALJ issued an unfavorable decision.  (AR 133-42.)  On June 19, 2018, the Appeals Council denied Mr. Copelin's request for review, rendering the ALJ's decision the Commissioner's final decision from which Mr. Copelin now appeals.  (AR 1-4.)

---

[3] Mr. Copelin initially applied for disability insurance benefits under Title II of the Social Security Act.  (AR 219.) However, it appears that he did not qualify for these benefits because his alleged onset date fell after his date last insured.  (AR 236.)

## II.  Legal Standards

### A.  Disability Determination Process

If a person is "disabled," he may qualify for SSI benefits under Title XVI.  42 U.S.C. §

1382(a)(1).  An individual is considered to be "disabled" if he is unable

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a).

The Commissioner has adopted a five-step sequential analysis to determine whether a

person satisfies the statutory criteria:

(1)  At step one, the ALJ must determine whether the claimant is engaging in "substantial gainful activity."[4]  If the claimant is engaging in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)  At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment (or combination of impairments) that is severe and meets the duration requirement, he is not disabled.

(3)  At step three, the ALJ must determine whether a claimant's impairment meets or equals in severity one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)  If none of the claimant's impairments meet or equal one of the listings, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  This step involves three phases.  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations."  20 C.F.R. § 416.945(a)(1).  This is called the claimant's residual functional capacity ("RFC").  *Id.*  Second, the ALJ must determine the physical and mental demands of the claimant's past relevant work.  Third, the ALJ must

---

[4] "Substantial work activity is work activity that involves doing significant physical or mental activities."  20 C.F.R. § 416.972(a).  "[W]ork may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. § 416.972(b).

determine whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is able to perform his past relevant work is not disabled.

(5)     If the claimant is unable to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant bears the burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing other work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. § 416.920(a)(4).

## B.     Standard of Review

This Court will affirm the Commissioner's final decision denying social security benefits unless: (1) "substantial evidence" does not support the decision; or, (2) the Commissioner did not apply the correct legal standards in reaching the decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* Although the Court may not re-weigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the [agency]'s findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the agency's] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The agency decision must provide the Court with a sufficient basis to determine that appropriate legal principles have been followed. *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Thus, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the ALJ . . . must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. <u>Analysis</u>

The ALJ found Mr. Copelin not disabled at step four of the sequential evaluation process. (AR 140.) At step one, the ALJ found that Mr. Copelin has not engaged in substantial gainful activity since his application date. (AR 135.) At step two, he found that Mr. Copelin has the severe mental impairments of affective disorder and borderline personality disorder. (*Id.*) However, he found that Mr. Copelin's physical impairments of obesity, hypertensive vascular disease, headaches, chronic kidney disease, hypertension, visual deficits, and breathing difficulties are non-severe or not medically determinable. (AR 135-36.) The ALJ determined at

step three that Mr. Copelin does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 136.)

At step four, the ALJ found that Mr. Copelin has the RFC to perform a full range of work at all exertional levels subject to the following non-exertional limitations:

> [Mr. Copelin] can understand, remember, and carry out two-step commands involving simple instructions, can concentrate and maintain persistence on simple tasks, and can complete tasks consisting of one to three step instructions. He is able to maintain extended periods of concentration and attention greater than 2-hour segments and maintain attendance and complete a normal workweek and maintain pace. [Mr. Copelin] can relate on a superficial basis to coworkers and supervisors, but is limited to occasional contact with the general public.

(AR 138.) Based on this RFC, the ALJ determined that Mr. Copelin can perform his past relevant work as a stock clerk or warehouse worker and is therefore not disabled. (AR 140.) Alternatively, the ALJ proceeded to step five, finding that Mr. Copelin can perform other work in the national economy and is not disabled for this reason as well. (AR 141.)

In support of his motion to reverse or remand, Mr. Copelin claims that the ALJ erred by finding that his hypertension, kidney disease, and headaches are not severe or medically determinable. (Doc. 22 at 2-4.) He also claims that the Appeals Council erred by declining to consider additional evidence he submitted after the administrative hearing. (*Id.* at 4-6.)

## A.     Summary of Record Evidence

### 1.     Function Reports

In September 2014, Mr. Copelin's mother, Diana Copelin, completed a third-party adult function report. (AR 248-55.) Ms. Copelin indicated that, as daily activities, Mr. Copelin cares for pets, checks the weather on television, does some yard work, home repair, or paperwork for his great aunt as needed and depending on how he feels, prepares dinner for Ms. Copelin and her

mother, and retires to his home, which is an RV on Ms. Copelin's property. (AR 45-46, 248-49.) Ms. Copelin reported that Mr. Copelin used to but can no longer camp, jog, hike, sculpt, work for longer periods of time, and be more physically active. (AR 249.) According to Ms. Copelin, Mr. Copelin walks, drives a car, shops for groceries and parts once a month, can pay bills and handle money, plays video games, cooks, has a girlfriend, and visits his great aunt twice a month. (AR 251-52.) Ms. Copelin also indicated that: (1) sometimes Mr. Copelin's hands and legs "go numb so he can't use them [and] he must stop[] [until] feeling comes back"; (2) he wakes with headaches and has them all day; and, (3) he has high blood pressure that his treatment providers have been unable to lower for any length of time. (AR 255.)

Mr. Copelin also completed an adult function report in September 2014. (AR 276-83.) According to Mr. Copelin, on many mornings he is "stuck in bed" for a few hours before he gets up, but if "lucky" he can "get a few things done" before noon. (AR 276.) Mr. Copelin reported that he then rests and cools down until 3:30 to 4:30 p.m., when he makes dinner for his mother and grandmother. (*Id.*) Afterward, he watches television or "mess[es] on the computer" until he gets to sleep, between 9:00 p.m. and 2:00 a.m. depending "on conditions." (*Id.*) According to Mr. Copelin, he either wakes every hour or two to go to the bathroom or sleeps through the night but wakes with a "major headache." (*Id.*) Mr. Copelin explained that on most days he wakes with a headache that worsens if he moves and usually takes a few hours to become "manageable." (AR 277.) Mr. Copelin confirmed that he cares for his pet, plans and cooks dinner for his mother and grandmother, does household chores, repairs, and yard work for short periods of time, walks, drives a car, shops for groceries and parts once a month or every other month, visits his girlfriend, and can pay bills and handle money. (AR 277-80.) Mr. Copelin also indicated that: (1) walking is "more of an issue with the heat"; (2) he cannot sit for extended

periods because his legs go numb; (3) he cannot climb a flight of steps without gasping for air; and, (4) his hands, legs, arms, and feet sometimes go numb.  (AR 283.)

### 2.    **Mr. Copelin's Testimony**

At the March 2017 administrative hearing, Mr. Copelin testified that, most mornings, he gets up, goes outside, goes back inside, and lays down until about noon, makes lunch, and then is up "for a little bit."  (AR 52.)  According to Mr. Copelin, he then lays back down until about 6:00 p.m., when he gets back up to cook dinner and then lays back down.  (*Id.*)  Mr. Copelin testified that, when lying down, he watches DVDs and "mess[es] around" on his computer.  (AR 52-53.)

Asked to identify the conditions that most interfere with his ability to work, Mr. Copelin testified that his primary issue is a breathing problem—due to chronic obstructive pulmonary disease ("COPD"), a medication side effect, or both—that causes him to gasp for air when he takes out the trash or carries groceries.  (AR 54-55.)  According to Mr. Copelin, he treats this problem with three prescription inhalers and with oxygen at night.  (AR 57-58, 78-79.)

As his second most disabling condition, Mr. Copelin identified migraines he has from once every two weeks to "almost every other day" and other headaches he has "pretty much every day."  (AR 58.)  According to Mr. Copelin, the visual effects of the migraines usually last from half an hour to two hours and the pain for half a day; the migraines often make him nauseous; and, it is "hard to do anything in that condition."  (AR 58-61, 82.)  Mr. Copelin testified that he recently started taking prescription medication for his migraines, and noted that he had an upcoming appointment with a neurologist to address them because his kidney disease prevented him from taking a lot of migraine medications.  (AR 58-61, 80.)  Regarding his other

headaches, Mr. Copelin testified that he wakes up with them, they are worse when he stands, and they are distracting and make it hard for him to focus. (AR 60-61, 85.)

As his third most disabling condition, Mr. Copelin identified sensitivity to cold, which causes him to shake when chilled, and heat, which causes him to sweat profusely and also affects his breathing and causes more frequent migraines. (AR 59, 62-64.)

According to Mr. Copelin, his fourth most disabling condition is high blood pressure. (AR 64-66.) In this regard, Mr. Copelin testified that: (1) his blood pressure improved with medication after twenty years of being elevated; (2) at the time of the hearing it was on the cusp of hypertensive; (3) it has "spiked back up" to 170/110 on medication; and, (4) it spikes "with stress and the heat." (AR 56, 65-66.) Mr. Copelin also testified that he gets chest pain upon exertion and more recently "out of the blue." (AR 82-83.)

Mr. Copelin identified failing kidneys as his fifth most disabling condition. (AR 66.) According to Mr. Copelin, this condition causes fatigue and "sharp pains in the flank" once every three days to once a week, and also raises his blood pressure. (AR 66-69.) Mr. Copelin testified that he sometimes has to stop in the middle of shopping to sit down due to fatigue. (AR 68.)

According to Mr. Copelin, his sixth most disabling condition is that he does not get along with people, which he attributed to being tired and irritable. (AR 69-70.)

Finally, as his seventh most disabling condition, Mr. Copelin identified numbness in his legs and hands. (AR 70-72.) Mr. Copelin testified that his legs get numb anytime he sits and that he has to move his hands when he drives to keep them from getting numb. (*Id.*)

### 3. Medical Records

Ben Archer Health Center ("BAHC") sent Mr. Copelin to the hospital in August 2010 after he sought treatment for low back pain, reported chest pain upon exertion, and had blood pressure of 208/140. (AR 311.) At the hospital, Mr. Copelin's blood pressure was reduced with medication. (AR 313-14.) An echocardiogram indicated mild left ventricular hypertrophy, mild aortic insufficiency, and mild mitral regurgitation. (AR 328.)

On December 4, 2014, Mr. Copelin saw consultative examiner Carol Abalihi, M.D., for a disability evaluation for hypertensive urgency, chronic headaches, shoulder, knee, and elbow joint pain, upper and lower back pain, stars/lightning in visual range, inability to handle heat, leg numbness, chest pain, depression, and lack of concentration and memory. (AR 341.) Dr. Abalihi assessed Mr. Copelin as having malignant essential hypertension, joint pain in multiple sites, and unspecified visual disturbances, and ordered x-rays of Mr. Copelin's elbow, shoulder, and spine, which revealed no abnormalities. (AR 341, 347-56.) She also advised Mr. Copelin to seek immediate medical attention for his blood pressure, which was 240/122 at the appointment. (AR 341, 45.) According to Dr. Abalihi, this "very elevated" blood pressure put him at "risk of severe morbidity including sudden death." (AR 341.) Mr. Copelin told Dr. Abalihi that he had stopped taking blood pressure medications three years earlier because they were not working and he could not afford them. (AR 341-42.) Dr. Abalihi opined that Mr. Copelin's symptoms were "partially proportionate to the expected severity of the medical diagnosis" and "partially consistent with the total medical and non-medical evidence." (AR 341.)

On December 11, 2014, Mr. Copelin saw psychologist Elaine Foster, Ph.D., for an independent consultative examination. (AR 357-62.) Dr. Foster's report focused on Mr. Copelin's mental impairments, which are not at issue in this appeal. (*See generally id.*) However, regarding Mr. Copelin's physical impairments, Dr. Foster did report that his

"performance on [a] mental status exam suggests evidence of moderate-to-severe difficulties with headache," and that his headaches "appear to have an effect on his adaptive functioning" and "limit his activities of daily living." (AR 361.)

A few days later, on December 16, 2014, Mr. Copelin sought treatment at BAHC for shortness of breath, headaches, heart palpitations, and chest pain. (AR 390-92.) BAHC sent him to Sierra Vista Hospital, where he was diagnosed with uncontrolled and malignant essential hypertension, a urinary tract infection, acute renal failure, and chronic renal parenchymal disease. (AR 378-82, 390-92, 398-402, 404, 416-18, 455-57.) He was discharged after two days of treatment with prescriptions for hypertension medication and instructions to follow up with his primary care provider and a nephrologist. (*Id.*) Also at Sierra Vista Hospital, Mr. Copelin had blood tests and urinalyses in January and April 2015, as well as a renal ultrasound in March 2015 that confirmed bilateral medical renal disease. (AR 478-94, 498-99, 504-06.)

On January 23, 2015, state agency non-examining medical consultant Eileen Brady, M.D., reviewed Mr. Copelin's medical records. (AR 104-06.) Dr. Brady concluded that, with treatment compliance, Mr. Copelin's hypertension was "not expected to result in any severe functional limitations." (AR 105.) She further concluded that his allegations of joint and back pain, heat intolerance, and numbness were not related to a medically determinable impairment and his statements regarding functional limitations related to them were "only partially creditable." (*Id.*) She noted his renal insufficiency as a medically determinable impairment but did not otherwise address it, and did not discuss his headaches. (*Id.*)

On July 10, 2015, state agency non-examining medical consultant B. Duong, M.D., reviewed Mr. Copelin's medical records, and opined that Mr. Copelin's physical ailments of hypertension, "acute o[r] chronic renal failure," chronic headaches, joint pain, back pain,

hypertensive retinopathy, heat intolerance, numbness of legs and feet, chest pain, and obesity were not severe or medically determinable, whether singly or combined.  (AR 121-22.)

BAHC records reflect that Mr. Copelin:  (a) saw Martha Anderson, C.N.P., in July, September, and November 2015, and January, March, April, May, June, July, and August 2016; (b) had electrocardiograms in March and July 2016; (c) had blood drawn in October and December 2015 and April and July 2016; and, (d) saw Alfredo Quiralte, P.A., in March 2016. (AR 533-36.)  In addition, CNP Anderson ordered a brain MRI in November 2015 and a chest CT scan in June 2016, and made referrals to a sleep specialist in March 2016, an ophthalmologist and physical therapist in June 2016, and a neurologist in August 2016.  (*Id.*)  Though the records from BAHC are terse, they do indicate that Mr. Copelin sought treatment for, *inter alia*, hypertension, chronic kidney disease, wheezing, hyperlipidemia, and visual disturbances, (AR 508-09), and was prescribed medications to treat, *inter alia*, hypertension, chronic kidney disease, headaches, wheezing, and bronchitis.  (AR 509-12, 526.)  These medications include Procardia XL,[5] doxazosin mesylate,[6] sodium bicarbonate,[7] Fiorinal,[8] atorvastatin,[9] lisinopril,[10]

---

[5]  Procardia XL, or nifedipine, "is used to treat high blood pressure and to control angina (chest pain)." https://medlineplus.gov/druginfo/meds/a684028.html (last visited Sept. 17, 2019).

[6]  *Inter alia*, doxazosin "is used alone or in combination with other medications to treat high blood pressure." https://medlineplus.gov/druginfo/meds/a693045.html (last visited Sept. 17, 2019).

[7]  *Inter alia*, sodium bicarbonate is prescribed "to make . . . blood or urine less acidic in certain conditions." https://medlineplus.gov/druginfo/meds/a682001.html (last visited Sept. 17, 2019).

[8]  Fiorinal is a combination of aspirin, butalbital, and caffeine that "is used to relieve tension headaches." https://medlineplus.gov/druginfo/meds/a601023.html (last visited Sept. 17, 2019).

[9]  "Atorvastatin is used together with diet, weight loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease."  https://medlineplus.gov/druginfo/meds/a600045.html (last visited Sept. 17, 2019).

[10]  "Lisinopril is used alone or in combination with other medications to treat high blood pressure." https://medlineplus.gov/druginfo/meds/a692051.html (last visited Sept. 17, 2019).

Advair Diskus,[11] Combivent Respimat,[12] labetalol,[13] isosorbide,[14] and clonidine.[15]  (*Id.*)  At his visits to BAHC from September 2015 to August 2016, Mr. Copelin's blood pressure ranged from a high of 140/88 in November 2015 to a low of 93/56 in May 2016.[16]  (AR 512-13, 527-28.)

In September 2016, Mr. Copelin saw ophthalmologist John Brinkley, M.D., regarding "chronic subjective visual disturbances" that Mr. Copelin described as constant flashes or blurred dots in both eyes.  (AR 540.)  Mr. Copelin reported that he has "adapted well" to the disturbances, which do not "stop him from doing anything."  (*Id.*)  Dr. Brinkley noted that Mr. Copelin's vision testing and eye exam were normal (except for corrected myopia), and that he and Mr. Copelin "[t]alked about a variety of possible explanations" for the visual disturbances "with emphasis on migraine" and "the use of daily prophylactic migraine agents in this setting." (AR 540-44.)

### B.  The Appeals Council erred by declining to consider the additional evidence Mr. Copelin submitted.

---

[11]  *Inter alia*, Advair Diskus, or fluticasone and salmeterol oral inhalation, is "used to prevent and treat wheezing, shortness of breath, coughing, and chest tightness caused by chronic obstructive pulmonary disease (COPD; a group of lung diseases that includes chronic bronchitis and emphysema)." https://medlineplus.gov/druginfo/meds/a699063.html (last visited Sept. 17, 2019).

[12]  Combivent Respimat, or albuterol and ipratropium oral inhalation, "is used to prevent wheezing, difficulty breathing, chest tightness, and coughing in people with chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways) such as chronic bronchitis (swelling of the air passages that lead to the lungs) and emphysema (damage to the air sacs in the lungs)."  https://medlineplus.gov/druginfo/meds/a601063.html (last visited Sept. 17, 2019).

[13]  "Labetalol is used to treat high blood pressure."  https://medlineplus.gov/druginfo/meds/a685034.html (last visited Sept. 17, 2019).

[14]  Isosorbide is "used for the management of angina (chest pain) in people who have coronary artery disease (narrowing of the blood vessels that supply blood to the heart)." https://medlineplus.gov/druginfo/meds/a682348.html (last visited Sept. 17, 2019).

[15]  Clonidine is "used alone or in combination with other medications to treat high blood pressure." https://medlineplus.gov/druginfo/meds/a682243.html (last visited Sept. 26, 2019).

[16]  Mr. Copelin's record of high blood pressure as late as November 2015 contradicts the ALJ's finding that Mr. Copelin had "no documented issues" with respect to his blood pressure after December 2014.  (*See* AR 136.)

After the ALJ issued his decision, Mr. Copelin submitted additional evidence to the Appeals Council, specifically: (1) treatment notes by Javed Iqbal, M.D., of Neurology Associates of Mesilla Valley, from April to June 2017; (2) reports by Paul Feil, M.D., of Sleep Lab of Las Cruces, from August 2016 to April 2017; and, (3) a letter from CNP Anderson dated August 16, 2017. (AR 10-15, 17-29, 31.) The Appeals Council declined to consider any of this additional evidence, finding no reasonable probability that the first two sets of records would change the outcome of the ALJ's decision, and that the letter from CNP Anderson did not relate to the period at issue. (AR 2.)

In his motion to reverse or remand, Mr. Copelin argues that the Appeals Council erred by declining to consider the additional evidence he submitted. (Doc. 22 at 4-6.) Regulations require the Appeals Council to review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."[17] 20 C.F.R. § 416.1470(a)(5) (effective Jan. 17, 2017). Evidence is "new" if it is "not duplicative or cumulative," "material" if "there is a reasonable possibility that it would have changed the outcome," and chronologically pertinent if it "relates to the period before the ALJ's decision." *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (alterations omitted). The requirement that a claimant show a reasonable *probability* that the additional evidence would change the outcome of the decision is read as a heightened materiality standard. *See, e.g.*, *Bisbee v. Berryhill*, No. 18-CV-0731 SMV, 2019 WL 1129459, at *3 n.5 (D.N.M. Mar. 12, 2019) (noting that new regulation "heightens the claimant's burden to prove materiality: whereas the previous

---

[17] To invoke the right to Appeals Council review based on the submission of additional evidence, the claimant must also show good cause for not informing the agency about the additional evidence or submitting it for the ALJ's consideration. 20 C.F.R. § 416.1470(b). Neither the Appeals Council below, nor the Commissioner in these proceedings, has contended that Mr. Copelin failed to satisfy this requirement.

test required merely a reasonable *possibility* of changing the outcome, now it requires a reasonable *probability* of changing the outcome") (emphases in original).

If additional evidence does not qualify for the Appeals Council's consideration, "it plays no further role in judicial review of the Commissioner's decision." *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). If the evidence does qualify and the Appeals Council considers it in connection with its review, it becomes part of the record that the district court assesses in evaluating the Commissioner's denial of benefits. *Id.* If, however, the Appeals Council errs by declining to consider qualifying additional evidence, the case must be remanded so that the Appeals Council may evaluate the ALJ's decision in light of the completed record. *Id.*; *Casias v. Saul*, No. 1:18-CV-00537-LF, 2019 WL 4013890, at *3-*4 (D.N.M. Aug. 26, 2019.

The *Chambers* court explained that "the case should be remanded" if the Appeals Council declined to consider additional evidence that qualifies under 20 C.F.R. § 416.1470(a)(5), because the Appeals Council "has the responsibility to determine in the first instance whether, following submission of additional, qualifying evidence, the ALJ's decision is contrary to the weight of the evidence currently of record." 389 F.3d at 1142-43 (quotation marks omitted). Only after the Appeals Council reviews the ALJ's decision in light of the completed record may the Court "properly review the denial of benefits . . . under the deferential substantial-evidence standard." *Id.* Whether additional evidence qualifies for the Appeals Council's consideration under 20 C.F.R. § 416.1470(a)(5) is a question of law subject to *de novo* review. *Chambers*, 389 F.3d at 1142; *Threet*, 353 F.3d at 1191; *Casias*, 2019 WL 4013890 at *3. The Court will analyze each set of additional documents the Appeals Council declined to consider in accordance with these standards.

## 1.    Dr. Iqbal's Treatment Notes

Dr. Iqbal's treatment notes reflect that Mr. Copelin was referred to him due to chronic headaches and migraines.  (AR 13.)  At an initial visit on April 21, 2017, Dr. Iqbal examined Mr. Copelin and diagnosed him with: (1) intractable chronic migraine without aura and with status migrainosus[18]; (2) visual symptoms; and, (3) dizziness.  (AR 13-14.)  Dr. Iqbal prescribed Depakote[19] and ordered a head CT scan, the results of which were unremarkable.  (AR 13-15.)  On June 8, 2017, Mr. Copelin returned to Dr. Iqbal for a follow-up visit, reporting daily headaches that Depakote had not helped.  (AR 11.)  Per his treatment notes, Dr. Iqbal reviewed the results of the CT scan with Mr. Copelin, prescribed Topamax,[20] and maintained his diagnoses of intractable chronic migraine without aura and with status migrainosus, visual symptoms, and dizziness.  (AR 11-12.)

Mr. Copelin contends that the Appeals Council erred by finding no reasonable probability that Dr. Iqbal's treatment notes would change the outcome of the ALJ's decision.  (Doc. 22 at 4-6.)  The Court agrees.  "Additional evidence that, if otherwise qualified under 20 C.F.R. [§ 416.1470] and adopted upon consideration, would result in a more restrictive RFC and render the ALJ's determination of the claimant's RFC unsupported by substantial evidence is material."  *Arellano v. Saul*, No. CV 18-600 KK, 2019 WL 4016280, at *10 (D.N.M. Aug. 26, 2019) (citing *Padilla v. Colvin*, 525 F. App'x 710, 712-13 (10th Cir. 2013)).  As explained below, Dr. Iqbal's treatment notes, if considered and adopted, would establish that Mr. Copelin's migraines

---

[18] The International Headache Society's International Classification of Headache Disorders, Third Edition, defines "status migrainosus" as "[a] debilitating migraine attack lasting for more than 72 hours" that may include "[r]emissions of up to 12 hours due to medication or sleep."  https://ichd-3.org/1-migraine/1-4-complications-of-migraine/1-4-1-status-migrainosus/ (last visited Sept. 26, 2019).

[19] Depakote, or divalproex sodium, is used, *inter alia*, "to prevent migraine headaches."  https://medlineplus.gov/druginfo/meds/a682412.html (last visited Sept. 26, 2019).

[20] Topamax, or topiramate, is used, *inter alia*, "to prevent migraine headaches."  https://medlineplus.gov/druginfo/meds/a697012.html (last visited Sept. 26, 2019).

constitute a severe, medically determinable impairment that imposes significant functional limitations not included in the RFC the ALJ assigned to Mr. Copelin. This would undercut the ALJ's findings at steps two and four and result in a more restrictive RFC.

In his decision, the ALJ found Mr. Copelin failed to demonstrate significant limitations associated with any of his physical impairments because: (1) "they have been responsive to treatment"; (2) they "cause no more than minimally vocationally relevant limitations"; (3) they "have not lasted or are not expected to last at a 'severe' level for a continuous period of 12 months or expected to result in death"; and/or, (4) they "have not been properly diagnosed by an acceptable medical source."[21] (AR 135.) Regarding Mr. Copelin's migraines in particular, the ALJ further found "no evidence supporting [their] frequency or intensity."[22] (AR 136.) Consequently, the ALJ determined that Mr. Copelin's migraines are not severe or medically determinable at step two. (AR 135-36.) Further, relying on his step-two findings at step four, the ALJ found no functional limitations associated with Mr. Copelin's migraines and omitted any such limitations from Mr. Copelin's RFC. (AR 140.)

Dr. Iqbal's treatment notes, if considered and adopted, would cure each of the deficiencies the ALJ identified in the record evidence regarding Mr. Copelin's migraines. First, by describing the migraines as "intractable" and "chronic," and by changing Mr. Copelin's prescription medication on June 8, 2017, Dr. Iqbal's notes show that Mr. Copelin's migraines were not responsive to treatment through that date. Second, by documenting Dr. Iqbal's

---

[21] The ALJ gave these reasons for finding that all of Mr. Copelin's physical impairments are non-severe or not medically determinable; however, he did not clearly indicate which reasons applied to which impairments. (AR 135-36.)

[22] The Court notes that the ALJ misstated Mr. Copelin's testimony regarding the usual duration of his migraines. According to the ALJ, Mr. Copelin testified that his migraines last between thirty minutes and two hours. (AR 135.) In fact, Mr. Copelin testified that the *visual effects* of his migraines last from thirty minutes to "a couple hours," and the pain lasts "about half a day." (AR 58-59.)

diagnoses of intractable chronic migraine without aura and with status migrainosus, visual symptoms, and dizziness, the notes corroborate Mr. Copelin's testimony regarding his migraines' frequency, intensity, and consequent functional limitations. Third, Dr. Iqbal's notes confirm that Mr. Copelin's migraines—which Mr. Copelin described in a "Headache Questionnaire" in September 2014, for which he sought treatment at BAHC in August 2016, and about which he testified in March 2017—persisted through at least June 2017, *i.e.*, for well over two years. (AR 58-59, 275, 509, 536.) Finally, the notes document that an acceptable medical source diagnosed Mr. Copelin's migraines. *See* 20 C.F.R. § 416.902(a)(1) (a "[l]icensed physician" is an "[a]cceptable medical source"); SSR 06-03P, 2006 WL 2329939, at *1 (Aug. 9, 2006) (same).

As a result, Dr. Iqbal's notes undercut the ALJ's step-two finding that Mr. Copelin's migraines are not severe or medically determinable. The Tenth Circuit has described the standard for showing a severe impairment at step two as "*de minimis*" and "nondemanding." *Langley*, 373 F.3d at 1123; *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997); *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). "[O]nly those claimants with slight abnormalities that do not significantly limit any basic work activity can be denied benefits [at step two] without undertaking the subsequent steps of the sequential evaluation process." *Langley*, 373 F.3d at 1123 (quotation marks omitted). Dr. Iqbal's treatment notes show that Mr. Copelin's migraines are more than a "slight abnormalit[y]" and corroborate Mr. Copelin's testimony that they significantly limit his ability to work on a regular basis. The notes also constitute "objective medical evidence from an acceptable medical source" that Mr. Copelin's migraines are a "medically determinable physical . . . impairment." 20 C.F.R. § 416.921.

In addition, Dr. Iqbal's notes undermine the RFC the ALJ assigned to Mr. Copelin at step four. When assessing a claimant's RFC, the ALJ must consider "all of [the claimant's]

medically determinable impairments of which [the ALJ] is aware." 20 C.F.R. § 416.945(a)(2).

Further, the RFC must be "based on all of the relevant medical and other evidence." 20 C.F.R. §

416.945(a)(3). Here, Dr. Iqbal's treatment notes corroborate Mr. Copelin's testimony that his

migraines are frequent, persistent, lengthy, and debilitating. However, the RFC the ALJ assigned

to Mr. Copelin did not account for the work-related limitations this kind of impairment would

impose. Hence, Dr. Iqbal's notes, if considered and adopted, would require a more restrictive

RFC. For these reasons, the Court finds a reasonable probability that Dr. Iqbal's treatment notes

would change the outcome of the ALJ's decision.

The Commissioner suggests that Dr. Iqbal's records are immaterial because the results of

Mr. Copelin's neurological examination and CT scan were unremarkable. (Doc. 24 at 14.) The

Court disagrees. True, there must be "objective medical evidence from an acceptable medical

source" to show that a claimant has a pain-producing medical impairment that renders him

disabled. 20 C.F.R. §§ 416.921, 416.929(a). However, "objective medical evidence" includes

not only "laboratory findings" but also "medical signs," including those established by clinical

diagnostic techniques. 20 C.F.R. § 416.929(b); *see also Luna v. Bowen*, 834 F.2d 161, 162 (10th

Cir. 1987) ("objective evidence" in this context refers to "any evidence that an examining doctor

can discover and substantiate"). To be material, then, Dr. Iqbal's notes and diagnoses need not

be based on test results; rather, they may also be based on clinical observations.

Moreover, the ALJ must consider several factors in weighing a practitioner's medical

opinion, including the nature, extent, and length of the relationship (including whether it is a

"treating" or "examining" relationship), the consistency and supportability of the opinion

(including the extent to which "medical signs" and "laboratory findings" support it), the

practitioner's specialization, and "[o]ther factors." 20 C.F.R. § 416.927(c). Thus, that Dr. Iqbal

diagnosed Mr. Copelin with chronic, intractable migraines based on history and clinical observations is merely one factor to be considered in weighing his opinion, and fails to eliminate the reasonable probability that his treatment notes would change the outcome of the ALJ's decision.

## 2. Dr. Feil's Reports

Dr. Feil's records regarding Mr. Copelin consist of two polysomnography reports dated August 15, 2016 and April 5, 2017, and a pressure titration report dated April 8, 2017. (AR 17-29.) In his August 15, 2016 report, Dr. Feil noted the results of Mr. Copelin's first polysomnography and diagnosed him with hypoxia and mild/trivial central and hypopneic apnea. (AR 17.) Dr. Feil prescribed oxygen at two liters per minute through sleep "for COPD" and advised Mr. Copelin to avoid operating machinery while drowsy. (*Id.*)

In his April 5, 2017 report, Dr. Feil noted that Mr. Copelin reported "poor sleep in setting of renal insufficiency, COPD FEV1 69%, neuropathy, AM HEADACHES, SLEEP CHOKE AND SNORE WITH BREATH PAUSE," and that he had "been using O2 in sleep without improved sleep quality." (AR 21 (emphasis in original).) Based on the results of Mr. Copelin's second polysomnography, he diagnosed Mr. Copelin with hypoxia and snore with mild obstructive sleep apnea, prescribed continuous positive airway pressure ("CPAP") titration, and again advised Mr. Copelin to avoid operating machinery while drowsy. (*Id.*)

In his April 8, 2017 pressure titration report, Dr. Feil noted Mr. Copelin's morning headaches as well as his existing diagnosis of obstructive sleep apnea. (AR 25.) Based on the results of Mr. Copelin's pressure titration and two previous polysomnographies, Dr. Feil diagnosed Mr. Copelin with hypoxia and mild to moderate obstructive sleep apnea with aspects of upper airway resistance syndrome. (*Id.*) Dr. Feil observed that morning headache was "not

noted" after CPAP titration. (*Id.*) He prescribed CPAP therapy and again advised Mr. Copelin to avoid operating machinery while drowsy. (*Id.*)

Mr. Copelin contends that the Appeals Council erred by finding no reasonable probability that Dr. Feil's records would change the outcome of the ALJ's decision. (AR 2.) As noted above, additional evidence satisfies this materiality standard if it "would result in a more restrictive RFC and render the ALJ's determination of the claimant's RFC unsupported by substantial evidence." *Arellano*, 2019 WL 4016280 at *10 (citing *Padilla*, 525 F. App'x at 712-13). Here, the Court finds that Dr. Feil's reports are material because, if considered and adopted, they would demonstrate that Mr. Copelin's morning headaches are a symptom of medically determinable impairments at step two. Specifically, the reports constitute "objective medical evidence from an acceptable medical source" that Mr. Copelin's morning headaches are causally connected to his medically determinable impairments of hypoxia and obstructive sleep apnea. 20 C.F.R. § 416.921.

Further, if Dr. Feil's reports establish that Mr. Copelin's morning headaches are a symptom of medically determinable impairments at step two, this could result in a more restrictive RFC at step four. At step four, an ALJ must consider "all of the relevant medical and other evidence" regarding functional limitations caused by "all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including . . . medically determinable impairments that are not 'severe.'" 20 C.F.R. § 416.945(a)(2), (3). If Mr. Copelin's hypoxia and obstructive sleep apnea are found to be medically determinable impairments, then the ALJ must consider all of the relevant evidence about the limitations they cause, including limitations due to morning headaches. Such evidence includes Mr. Copelin's testimony that these headaches interfere with his ability to work because they make it painful to stand and difficult to focus. It

also includes Dr. Foster's assessment that Mr. Copelin's headaches cause "moderate-to-severe difficulties," "appear to have an effect on his adaptive functioning," and "limit his activities of daily living." (AR 361.) Mr. Copelin's RFC did not account for these limitations and would be more restrictive if it did. The Court therefore finds a reasonable probability that Dr. Feil's records would change the outcome of the ALJ's decision.

The Commissioner argues that Dr. Feil's reports are immaterial because Mr. Copelin has failed to allege any functional limitations arising from sleep apnea. (Doc. 24 at 14.) The Commissioner is mistaken. As just discussed, Dr. Feil's reports indicate a causal connection between Mr. Copelin's diagnoses of hypoxia and obstructive sleep apnea and his morning headaches, and Mr. Copelin testified to functional limitations arising from these headaches. The Commissioner's argument fails to account for the resulting connection between the impairments Dr. Feil diagnosed and the limitations to which Mr. Copelin testified, and thus fails to eliminate the reasonable probability that Dr. Feil's reports would change the outcome of the ALJ's decision.

### 3. CNP Anderson's Letter

Finally, CNP Anderson's August 16, 2017 letter states:

> [Mr.] Copelin has been my patient for the past three years. Patient has several health challenges which affect his blood pressure. Patient has a history of severe chronic kidney disease secondary to his high blood pressure. Mr. Copelin requires several blood pressure medications to control his high blood pressure. Working daily along with other stressors would likely worsen this patient's blood pressure control and adversely impact his health.

(AR 31.) The Appeals Council declined to consider this letter because, it stated, the letter "does not relate to the period at issue," *i.e.*, the period "on or before June 23, 2017." (AR 2.)

To qualify for the Appeals Council's consideration, additional evidence must relate to the period on or before the date of the ALJ's decision. 20 C.F.R. § 416.1470(a)(5). "Additional

evidence relates to the period on or before the date of the hearing decision if," *inter alia*, "the evidence post-dates the hearing decision but is reasonably related to the time period adjudicated in the hearing decision." HALLEX I-3-3-6(B)(2), 1993 WL 643129 (May 1, 2017). "For example, a statement may relate to the period on or before the date of the hearing decision when it postdates the decision but makes a direct reference to the time period adjudicated in the hearing decision." *Id.* Evidence postdating the ALJ's decision also "relates to" the period before the decision when it corroborates an existing diagnosis and/or evidence that was before and considered by the ALJ. *See Padilla*, 525 F. App'x at 711, 713 (holding that Appeals Council should have considered medical evaluations completed after ALJ's decision because they corroborated a diagnosis pre-dating the administrative hearing and related to impairments claimant testified about at the hearing). Fundamentally, the question is whether the additional evidence is pertinent to and sheds light on an issue that was before the ALJ. *See id.*; *Arellano*, 2019 WL 4016280 at \*11; *Casias*, 2019 WL 4013890 at \*5.

Here, CNP Anderson's August 16, 2017 letter postdates the ALJ's June 23, 2017 decision. (AR 31, 142.) Nevertheless, the Court finds that, contrary to the Appeals Council's determination, the letter directly relates to whether Mr. Copelin was "disabled beginning on or before June 23, 2017" and is therefore chronologically pertinent. (AR 2.) First, it "makes a direct reference to the time period adjudicated in the hearing decision." HALLEX I-3-3-6(B)(2). Specifically, CNP Anderson begins her letter by stating that Mr. Copelin has been her patient for "the past three years." (AR 31.) In so doing, she directly refers to the two years and ten months preceding the ALJ's decision.

In addition, CNP Anderson's letter corroborates diagnoses pre-dating the ALJ's decision and evidence the ALJ considered. *See Padilla*, 525 F. App'x at 711, 713. Initially, the letter

corroborates Mr. Copelin's diagnoses of hypertension and secondary chronic kidney disease. These diagnoses pre-date the ALJ's decision, and evidence of them is part of the record the ALJ considered. For example, records from Sierra Vista Hospital indicate that both disorders were diagnosed by December 2014; and, records from BAHC confirm that Mr. Copelin received treatment for them through August 2016. And indeed, the ALJ's decision directly acknowledges Mr. Copelin's diagnoses of "hypertension" and "chronic kidney disease." (AR 135-36.)

Further, and significantly, CNP Anderson's letter corroborates and clarifies record evidence about the effects of Mr. Copelin's hypertension. In her letter, CNP Anderson noted that Mr. Copelin's chronic kidney disease is secondary to hypertension, and that he "requires several blood pressure medications to control his high blood pressure." (AR 31.) In addition, she opined that "[w]orking daily along with other stressors would likely worsen this patient's blood pressure control and adversely impact his health." (*Id.*) This clarifies the medical record evidence regarding the cause of Mr. Copelin's kidney disease and the purpose of his medications, as well as Dr. Abalihi's assessment that he "stands the risk of severe morbidity including sudden death" from "very elevated" blood pressure. (AR 341.) It also corroborates Mr. Copelin's testimony that, despite multiple medications, stress causes his blood pressure to "spike[] back up." (AR 65-66.) For all of these reasons, the Court concludes that CNP Anderson's letter relates to the time period before the ALJ's decision, and the Appeals Council erred in finding to the contrary.

The Commissioner argues that, even if CNP Anderson's letter does relate to the period before the ALJ's decision, it still does not qualify as additional evidence the Appeals Council must consider because there is no reasonable probability that it would change the decision's outcome. (Doc. 24 at 15.) Again, the Court disagrees. As explained below, CNP Anderson's

letter satisfies the materiality standards of 20 C.F.R. § 416.1470(a)(5) because it undercuts the ALJ's findings at steps two and four and, if considered and adopted, would result in a more restrictive RFC. *Arellano*, 2019 WL 4016280 at *10; *Padilla*, 525 F. App'x at 712-13.

The ALJ found that Mr. Copelin's physical impairments were non-severe or not medically determinable at step two because, *inter alia*,

> they have been responsive to treatment, cause no more than minimally vocationally relevant limitations, [or] have not lasted or are not expected to last at a "severe" level for a continuous period of 12 months or expected to result in death.[23]

(AR 135.) The ALJ emphasized that Mr. Copelin's hypertension, in particular, was non-severe because it "normalized with treatment and he only received conservative follow-up appoint[ment]s for disease management." (AR 136.) At step four, the ALJ relied on his step-two findings to conclude that Mr. Copelin's "record did not support physical limitations." (AR 140.) Thus, the ALJ included no physical limitations related to hypertension in Mr. Copelin's RFC. (AR 138.)

CNP Anderson's letter undermines the ALJ's reasons for finding Mr. Copelin's hypertension non-severe and for including no limitations related to it in his RFC. The ALJ concluded that Mr. Copelin's hypertension is non-severe and causes no more than minimal vocational limitations because, he found, it is fully controlled with treatment. (AR 135-36.) However, CNP Anderson's letter corroborates Mr. Copelin's testimony and other record evidence that, though he takes several medications for hypertension, stress still causes his blood pressure to rise to harmful levels. In other words, if adopted, the letter would establish that: (1) even multiple medications do not fully control Mr. Copelin's blood pressure; and, (2) his

---

[23] The ALJ also found that Mr. Copelin's physical impairments are not severe or medically determinable because they have not been properly diagnosed by an acceptable medical source. (AR 135.) However, the record establishes beyond any rational debate that Mr. Copelin's hypertension has been diagnosed by acceptable medical sources.

consequent need to avoid the stress of "[w]orking daily" imposes a significant vocational restriction on him. The inclusion of this restriction would result in a more limited RFC, and the Court therefore finds it reasonably probable that CNP Anderson's letter would change the outcome of the ALJ's decision.

The Commissioner argues that CNP Anderson's letter is immaterial because, in it, she does not state that Mr. Copelin "cannot work" or "otherwise offer an opinion of his functional limitations as a result of his impairments." (Doc. 24 at 15-16.) In so arguing, the Commissioner reads CNP Anderson's letter too narrowly. While CNP Anderson does not expressly state that Mr. Copelin "cannot work," she clearly does state that "[w]orking daily" would likely worsen his blood pressure control and "adversely impact his health." (AR 31.) In light of other record evidence documenting the adverse health impacts Mr. Copelin has suffered and is likely to suffer from poorly controlled hypertension, including acute and chronic kidney disease and sudden death, CNP Anderson's letter at least indicates that Mr. Copelin's ability to tolerate the stress of working daily is significantly limited.

The Commissioner also argues that CNP Anderson's letter is inconsistent with BAHC records documenting that Mr. Copelin's blood pressure "was consistently stable with medication." (Doc. 24 at 16.) However, this argument is fatally flawed in two respects. First, it is factually inaccurate. BAHC records indicate that Mr. Copelin's blood pressure remained high for months after he began receiving treatment for it. (AR 527.) Second, the argument ignores that Mr. Copelin did not "work[] daily" during the three-year period CNP Anderson addressed. As such, her opinion that working daily would likely destabilize Mr. Copelin's blood pressure presents no conflict with records tending to show that his blood pressure was stable when this

"stressor" was absent.  For all of the foregoing reasons, the Court finds that the Appeals Council erred by declining to consider CNP Anderson's letter.

In sum, the Court will remand this matter to the Appeals Council to determine in the first instance whether, upon consideration of the additional, qualifying evidence Mr. Copelin submitted—*i.e.*, the records of Drs. Iqbal and Feil and CNP Anderson's letter—"the ALJ's decision is contrary to the weight of the evidence currently of record."  *Chambers*, 389 F.3d at 1143 (quotation marks omitted).

## C.  <u>Remaining Issues</u>

Mr. Copelin also claims the ALJ erred in finding that his malignant hypertension, chronic kidney disease, and headaches are non-severe or not medically determinable.  (Doc. 22 at 2-4.) The Court will not address Mr. Copelin's remaining claim of error because it may be affected by the Commissioner's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV.  <u>Conclusion</u>

For the reasons stated herein, Mr. Copelin's Motion to Reverse the Administrative Law Judge (ALJ) Unfavorable Decision Dated June 23, 2017 As Well As the Appeals Council Ruling Dated June 19, 2018:  Alternatively Motion to Remand Case Back to the Administrative Law Judge (Doc. 21) is GRANTED.  This case is remanded to the Appeals Council to be reviewed in light of the qualifying additional evidence Mr. Copelin submitted.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent